This appeal is about holding Lilly accountable for its statements made to the FDA while seeking regulatory approval for Polenta. Statements that are at odds with those now made to the PTO and to this Court to save its patent, and statements that the PTAB intentionally ignored, which is legal error. In Lilly's admissions to the FDA or not, all that the PTAB improperly ignored in its decision. It also ignored many of the teachings of the PTAB, which is also legal error. Turning to the FDA communications, prior to the patent's filing date, Lilly communicated in a series of letters to the FDA that are not prior art, not because of their date, but because they were not disseminated and published. Am I correct that the appellants are asking us to address their 101 arguments presented for the first time on appeal? Yes, you are, Your Honor. I must be, because you couldn't have them below. It's an interesting argument. Putting aside for a moment the inter-parties versus ex-parties distinction that you request us to find determinative, are you arguing that no matter the context, even if a statute expressly prohibits the party below from raising 101, which of course the statute does, an appellant should always be able to assert 101 on appeal as effectively jurisdictional or equivalent to jurisdictional, or what? For the most part, yes, Your Honor. We believe that when the 101 decision is a question of law, it is appropriate for this court to determine as a threshold matter whether or not it was raised below. As you mentioned, the commission... But even questions of law have to be preserved below, and if it's not only not preserved, but prohibited from being raised below, how can we, in the context of administrative review, rely on a ground not raised to or relied on by the administrative agency? Well, the APA says that this court shall decide all questions of law. How can you square it with Berkheimer? Berkheimer states that there may be underlying questions of law in the 101 decision, but it explicitly states that not all 101 decisions... That's true, but doesn't it have to be addressed below? Should we look, if the other side says there are factual questions, do we say, throw up our hands and say, oh, my goodness. Well, fortunate... Even if it's a pure legal issue, doesn't Chenery require that we only affirm or decide APA cases based upon the grounds relied on by the agency below? How could we resolve this case on 101 and be consistent with Chenery? Chenery was cited in Kamitsky when Kamitsky decided that even though 101 was not raised before the PTO below, that it could still be raised as a threshold issue before this court. It's similar to the Aoyama case in which this court looked at indefiniteness for the first time, even though that could happen. At least in Kamitsky, 101 potentially could have been relied on by the agency in resolving that case and could have been a potential legal ground for the rejection of the claims. There are some exceptions to Chenery for things like that, but when it is not at all possible for it to be a potential legal ground for the agency to rely on, how is it consistent with Chenery for us to look at it? Well, Kamitsky explains that Chenery does not... The Chenery position does not apply when it would be wasteful to send a decision back down to... Well, in fact, we can't send this back down for them to do 101. We can't. In Kamitsky, they did, right? On the apparatus claims, they actually remanded to the PTO and said, now you address 101 in the first instance. We can't even do that here, can we? I don't believe so. The statute says that the petitioner cannot raise 101. It does not necessarily prohibit the board from deciding 101 on its own. Wait, you think that after SAS was decided by the Supreme Court, the board is now free to renegade petitions, go off petition, in fact, go off statute and decide on whatever basis it wants? The board cannot go off statute. But this court is not obligated or is not held to that statute. This court can decide any issue of law. And we submit that this would be a proper use of judicial resources to... Enablement is a question of law. You're telling me you can raise enablement on appeal from an IPR and I have to or should decide it, even though you clearly can't raise enablement in an IPR. Enablement is a question of law. I have never... You're telling me all questions... There's a million patent law questions of law. Whether something's a printed publication is a question of law, but there are a lot of them and many of them cannot be raised in IPRs. But you're telling me all of those are fair game on appeal at the Federal Circuit, despite the fact that Congress has said they expressly cannot be raised in IPRs. No, the US Supreme Court has said that patentability is a threshold issue. And so we think that when we're discussing patentability, that that is a threshold issue that... But not in the terms of a jurisdictional issue, right? It's a threshold merits issue. It is a threshold merits issue, although what the Supreme Court has said is that you don't get to 102, 103 if something is not patentable. So what? I mean, if Congress had wanted threshold issue to be involved in IPRs, they could have done it, but they didn't. And they expressly made it available in CBMs with the same statute, right? The same statute, the AIA comes out and CBMs is expressly available, and in IPRs, it's expressly not available. I mean, what you're asking us to do is in, you know, a sharp departure from what Chenery requires and what other courts do in administrative law cases from other agencies. There's no way that other courts come up with a brand new legal theory on appeal that the agency couldn't have relied on to resolve the case. Can you cite even one single instance of that? I cannot. We agree that this is an issue of first impression, but we believe that under Kaminsky that this court has the authority to look at 101. What do you think in Kaminsky allows us to do that? In Kaminsky, at least, the agency had the authority to decide the issue before it. You're asking us to take it a step farther and say, even if the agency didn't have the authority, we do. Can you cite a single case from any court that's ever stood for that proposition? No, Your Honor. We acknowledge this is an issue of first impression, but we also are not standing— I think if we agreed with you, we would get a 9-0 reversal from the Supreme Court in a matter of months. Understood, Your Honor. But we also are not standing on the 101 issue exclusively. We have, we believe, a very strong obviousness problem here. Am I correct that the parties don't dispute that, despite their express teachings regarding folic acid pretreatment, Grindley, Hammond 1, and Warzawa do not teach anything regarding the administration of vitamin B12? The particular references that you just mentioned do not teach anything regarding vitamin B12. The EPO05 reference, on the other hand, which has not been before this court before, does teach administering B12 in addition to folic acid to achieve a synergistic effect in lowering homocysteine. For cardiovascular disease? Actually, the EPO05 says that it's for lowering homocysteine from any known cause. Okay, but there is evidence in this record, and this seems to me is a question of fact, that B12 pretreatment could increase tumor growth and therefore was counter-indicated for cancer treatment. So it's a question of fact. Maybe you're right about what EPO says. It seems tangential at best, but there's direct evidence that tumors will grow bigger with B12. Do you want me to reverse the PTO's fact-finding, given that state of the record? The PTO actually did not find that there was evidence of tumor growth. The PTO, when it mentioned tumor growth, was merely regurgitating Lilly's position, saying that Lilly argued that there is evidence for tumor growth. But contrary to what Lilly states in its briefs, if you look at where they actually cited that, the PTO never made a factual finding that there is evidence that adding B12 could give tumor growth. In fact, Lilly has admitted to the FDA in correspondence trying to get a drug that's going to be administered to patients out into the public. What Lilly told the FDA was that for vitamin B12, this is a direct quote, literature searches found no evidence for stimulation of tumor growth by this vitamin. That is in the record, and that is a pre-priority date admission by Lilly to the FDA. Let me ask you this. Do you want us to rely on your expert testimony, like Dr. Bleier, to support a finding that it was known that cancer patients being treated are more likely to have B12 deficiencies, and therefore a person would be motivated to include it? But in the IRP 237 proceeding, the PTAB found that Dr. Bleier's testimony was unclear and internally inconsistent, correct? Yes, Your Honor. So how can we disrupt that credibility finding at this level? We're not asking this court to disrupt any credibility findings. We're asking this court to address the errors of law that the PTAB made in the case, that they actually applied the incorrect legal standards in coming to their factual findings. For instance, the PTAB refused to look at Lilly's admissions at all, that they refused to read the prior art references in light of Lilly's communications to the FDA. The communications to the FDA were made after the critical date with the benefit of the inventor's discoveries in this case. So while the PTAB may have said so inartfully by suggesting simply they're not prior art, I don't see how they were nonetheless right in disregarding those statements, because the statements about what was known are being made by the company that figured out the solution to this problem that came up with this invention. That company is making statements to the FDA about what it knows right then and there, which include the knowledge that these inventors developed by virtue of their invention. So I guess for me, while the PTO may not have in the most artful way explained why those statements are not going to carry any water in this case, it's nonetheless entirely correct given the state of the art and the timing of the statements. The statement that I just read, for instance, is that literature searches found no evidence for stimulation of tumor growth by this vitamin. That is not a statement that is reflecting in any way any invention that Lilly had made. That is simply a statement of the knowledge that a POSA would have at the time. And that is not – the PTO cannot legally disregard that. No, it's not a statement. It's a statement of what a literature search uncovered for them. They performed a literature search and it didn't uncover something. It's not actually a statement of what a POSA would understand. But if we want to find a statement of what a POSA would understand, please turn to page 9031 of your appendix. So this is the expert declaration, where – 9031. Go ahead. Well, this is where the expert says that although the prior art, and in particular, the Nye-Kaziza – I'm sorry, I'm sure I'm saying that wrong – Abstracts, indicates that there is a correlation between homocysteine levels and the development of various toxicities in patients who received Hemantrexid, the prior art specifically recognized that a cancer patient on an antifoliate should not receive folate to lower homocysteine levels, as that would be expected to interfere with the antitumor effect of the antifoliate. So you have expert testimony on this record that cites particular references on page 9031 and 9032 that was in front of the PTO, which makes the argument, or at least the factual assertion, that you should not combine these two things when dealing with antitumor, as opposed to cardiovascular for homocysteine levels, because it would interfere with the antitumor effects that you were seeking through the chemotherapy drugs that you were using. That is a substantial evidence question of fact. I can't see it any other way, so I'm having trouble understanding how that morphs into a question of law. The PTO actually rejected that factual finding that Your Honor just mentioned. The PTO, the PTAB found that it actually was obvious, despite Lily's expert testimony, to pre-treat with folic acid prior to giving patients Hemantrexid. So Lily did argue that, but the PTO rejected that as a factual finding. And I, I'm into my rebuttal. I'm sorry, let me be clear. I didn't read the first part of the sentence, which says they would not pre-treat a cancer patient receiving Permetrix with folic acid and B12. So I'm sorry, I didn't read completely the expert's paragraph, and you don't have it in front of you. So I understand why you responded the way you did. If it was limited to the folic acid, I understand your result, but it was my fault for not reading the whole thing, or possibly your fault for not bringing the appendix. I, I agree that there is a, there is evidence in the record that Lily presented, but we do submit that the FDA, or the PTAB erred in that it did not make its factual findings with the full record in front of it because it omitted portions of documents that it shouldn't. But I'd like to say there is more time for rebuttal. Okay, of course, and we'll restore two minutes because I asked you a lot of questions. Go ahead, Mr. Kerland. Oh no, Mr. Perlman. Perlman? Yes, Your Honor. Please proceed. Good morning, Your Honor. May it please the Court. Adam Perlman of Williams and Connolly on behalf of Eli Lilly. Let me start with a factual citation. The PTAB did find that administration of B12 would be thought to create a risk to the efficacy of the chemotherapy because in the only situation where B12 will have an effect in this circumstance, it will release an unpredictable amount of folate. That's at page 73. And then again, at pages 161 to 162. I mean, your evidence shows that B12 enhances the production of the RNA and DNA, which causes the molecules or the cells to replicate. And that's the exact opposite of what you want when you're treating cancer patients. Is that right? That is correct. Yeah, that's what I understood. Okay. On that point or overall? I got that point. If there's another point you would like to make. I will be brief. I'll hit the highlights here. On the FDA documents, I think Judge Moore hit exactly our central point. The PTAB found as a factual matter that our submissions to the FDA. But they were inartful. They kind of said, these aren't prior arts, so we're not going to consider them. And I don't think that was exactly right. I nonetheless don't think they made a mistake, but I don't think what they said was exactly right. Well, I take that critique, Your Honor. But I think if you read the context of the surrounding pages where they say, what they say is, first they block quote all the arguments petitioners make from the documents. So the substance of what they say was before them. And they say, they're not prior art. And we declined to read Lilly's statements as if they're prior art. But then they go on in the next paragraph. And they say, these were made by those who had knowledge of the invention. And obviousness requires having no knowledge of the invention. And they justify their reasoning. I agree that if I were to edit it, I would flip the order of those paragraphs. But I think read in context, that is what they're saying. And I think that is correct. The second point I would make on this, and it's conspicuously absent from any of the briefing. But Lilly never told the FDA, even with knowledge of the invention, that the prior art taught to pre-treat hemotrexate patients with vitamin B12. And what's interesting is the only reference in any ground that was before the PTAB or that's before you today that talks about the administration of vitamin B12 is the EP005 reference, which is not mentioned at all in any of these FDA submissions. And so in some ways, this is a bit of a tempest in a teapot. But the board was correct in its view that these documents were not probative of the issue before it. And there's no basis to overturn that. The other thing I will point out is that all of these references were before the board. Their experts' testimony about these references were before the board, our experts' testimony. And the board was well-positioned to make a factual determination on the merits which it did. In terms of the substantive issue, I don't want to belabor this because I think Judge Moore hit on the key point. But the relevance of homocysteine to this case is that Niakiza found that patients who had a certain pre-treatment level of homocysteine. Niakiza, that's not the way it sounded in my head at all. Niakiza. Thank you for saying it. Not a problem. I'll try to... Niakiza and hemotrexate. Hemotrexate. Yeah. That one I should have gotten. Well, they're both challenging. Niakiza found that patients who had a particular level of homocysteine prior to getting pemotrexate were predisposed to get certain pemotrexate toxicities. But before they got the pemotrexate, they weren't having any side effects. These are not people who have a homocysteine problem and they need treatment for the homocysteine. It's a marker for which patients the pemotrexate is going to cause toxicity for. And what's important to remember, as the board expressly found, is that homocysteine levels can be caused by multiple different things. One of them is a folic acid deficiency. One of them is an MMA deficiency. There are multiple other things. And if all you know is that there is elevated homocysteine, you don't know. It could be any of them. But there's a more specific marker, MMA, methylmalonic acid. And when that is unique to B12 deficiency, when that marker is elevated, the patient has a B12 deficiency. And so if you know both homocysteine levels and methylmalonic acid levels, it allows you to distinguish between the causes of the elevated homocysteine. And what the Niakisa 2 abstract reported, and the board made an express finding that our experts' reading was the correct reading on this, was that there was no correlation between patients' MMA levels and their toxicity. And so what that would have told the person of ordinary skill is that whatever was causing the elevated homocysteine, it was not a vitamin B12 deficiency. And the board found, and it's clearly supported by substantial evidence, that there would not have been any motivation to give vitamin B12 to lower homocysteine in that context. And the EP005 reference is addressed to an entirely different context. It's not about ameliorating the toxicities of a chemotherapy agent. It's not about the treatment of cancer. It doesn't say anything about what will happen to the efficacy of the cancer drug or the toxicities patients will suffer. It's addressed to a totally different problem. And the board found as a factual matter that the person of ordinary skill wouldn't have looked to it. And that's clearly supported by substantial evidence. The final point I will make, and I hesitate to even say it, but your honors are 100% correct on the 101 issue. The APA says... Thank you for agreeing. I do my best, your honor. The APA says a reviewing court may consider any relevant issue of law. That has to mean an issue of law relevant to the decision under review. Here, the decision under review has nothing to do with 101, could have nothing to do with 101. 101 is not a relevant issue of law under the APA. And Judge Moore is 100% correct that if you were to find there was a fact question under 101, which the law clearly provides there can be, you couldn't remand it to the board because they're prohibited from hearing it. Unless your honors have any questions, I will stop at that point. Okay. Thank you. Your honors, a few points in response. Mr. Perlman mentioned that there has to be this link, what it was been referred to as a missing link between the prior art, B-12 deficiency and Pemetrexid toxicity. But that was actually one of the errors of law that the PTAB committed and that it held that the appellants had to prove this quote unquote missing link in order to show motivation to combine. But KSR and many subsequent cases make very clear that it is improper to hold the appellants to the motivation of the inventor. There can be many motivations. And here the board actually found one of those motivations in its factual findings and disregarded it. In its factual findings for EP005 at A18, which is citing appendix 12209, the board found that EP005 says elevated homocysteine levels are highly undesirable and the normalization of elevated levels constitutes a therapeutic goal in and of itself. Of course, there can be many motivations for lowering homocysteine, but lowering homocysteine in and of itself is a motivation. The appellants have presented other motivations that were in the art, such as improving the folic acid regimen. The PTAB found that it was obvious to pre-treat with folic acid in order to lower, it was obvious to pre-treat with folic acid but not necessarily folic acid and B12 in combination with the Pemetret. Whatever that thing is, I can't say. But that's your problem. The problem isn't that there's not a motivation to combine B12 and folic acid for some purposes. And even that lowering homocysteine levels might be beneficial with cancer patients, but the problem was there was this counter indicator, which is, but, you know what? I don't think the homocysteine levels are as much of a problem as the tumors. And if there's a concern that the B12 addition is going to increase the growth in the tumors, that's what's gonna kill the people, not the homocysteine levels, so don't treat with that. So, I mean, that's, I mean, usually you treat a headache with Advil, but if the person's got a stomach ulcer, you're not gonna give them Advil. You know, that's the problem you have here. Motivation to combine them for lowering homocysteine levels, but not in patients with tumors. And I agree. That's the evidence anyway. Treating patients with tumors is incredibly important. And that's why Lilly's statements to the FDA when they're trying to get a drug approved to treat these patients are critical. Lilly cannot tell the FDA that there is zero evidence that a tumor will grow because of adding B12, and then come around when it's trying to save its patent and tell this court another thing. It just can't be the case that Lilly can't be held accountable for its admissions to the FDA that are prior to the patent's filing date. And I know Your Honor talked about them being post-invention, but there is zero evidence in the record, and the board made no finding that Lilly had possession of its invention at any point prior to the filing date. And so these pre-filing date communications are pre-priority date communications, and they matter. And so what Lilly said to the FDA about what a POSA would know, about whether or not there would be an expectation for tumor growth when adding B12, those statements have to matter. And if the board, by ignoring those statements, committed legal error. Did you argue below about what the critical date was in this case? We did not argue as to what the critical date was or not. It's Lilly's burden to prove that if they want to rely on something other than the priority date, then Lilly has the burden to prove that they are entitled to a date other than the priority date, and Lilly did not make such an argument. It's your argument that this record does not reflect that those statements were made after the date of invention? Yes, Your Honor. Great. Okay. Thank you both counsel for their arguments. Case is taken under submission. All rise.